**ANGELA O'BRIEN, Appellant**

v.

**UNITED STATES, Appellee.**

**Nos. 02–CF–175, 05–CO–313.**

District of Columbia Court of Appeals.

Argued June 15, 2006.
Decided Dec. 23, 2008.

---

38. *In re Corizzi, supra* note 34, 803 A.2d at 443.

Allie J. Sheffield, appointed by the court, for appellant.

Lisa H. Schertler, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney at the time the brief was filed, John R. Fisher, Assistant United States Attorney at the time the brief was filed, and Roy W. McLeese, III, Thomas J. Tourish, Jr., James S. Sweeney, and Patricia A. Heffernan, Assistant United States Attorneys, were on the brief and supplemental briefs, for appellee.

Before RUIZ, Associate Judge, FARRELL, Associate Judge, Retired,* and TERRY, Senior Judge.

TERRY, Senior Judge:

Appellant O'Brien was convicted of second-degree murder of a young child, first-degree cruelty to children, two counts of assault, and obstruction of justice. On appeal she presents several claims of error. Her principal argument is that the trial court erred in denying her post-trial motion for a new trial based on newly discovered evidence that one of the government's expert witnesses allegedly committed perjury. She also maintains that the court erred in failing to strike that same witness' testimony when presented with evidence that he misrepresented his credentials at trial, and also erred in pre-cluding her from calling witnesses who would support her claim. She further contends that the trial court erred in prohibiting her from introducing evidence of her mental retardation to negate the *mens rea* element of those offenses which require the government to prove specific intent. Appellant claims that the court abused its discretion by precluding her from introducing any evidence of the circumstances surrounding the victim's placement in her home. She asserts that the court violated her right to present a defense and committed constitutional error by refusing to allow her to offer evidence of bias by the police, prosecutors, and social workers, and by failing to conduct what she refers to as a "taint hearing." In addition, she argues that the trial court committed reversible error by admitting the medical examiner's secondary diagnosis of child abuse which, she maintains, was based purely on speculation, and by allowing the government to make use of several autopsy photographs in its closing argument. Finally, appellant argues that her conviction of obstruction of justice resulted from a constructive amendment of the indictment, in violation of the Grand Jury Clause of the Constitution. We reject all of these arguments and affirm both the judgment of conviction and the denial of appellant's motion for new trial.

I

Appellant was charged in eight counts of a ten-count indictment with conspiracy to commit second-degree cruelty to children (count one), second-degree cruelty to children (counts two and six), first-degree cruelty to children (counts three and seven), assault with a dangerous weapon (count four), first-degree felony murder (count

* Judge Farrell was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on July 1, 2008.

eight), and obstruction of justice (count ten). All of these charges arose out of the death of twenty-three-month-old Brianna Blackmond on January 6, 2000.[1]

### A. Pre–Trial Motions

#### 1. Appellant's Mental Capacity

The government moved before trial to preclude appellant from presenting a diminished capacity defense. Appellant had previously given written notice that she intended to raise "cognitive deficits, including mental retardation ... as a defense to the elements of the offense." The government argued that because "diminished capacity is not a recognized defense" in the District of Columbia, the proposed defense testimony was inadmissible, citing *Bethea v. United States*, 365 A.2d 64 (D.C.1976).

In response, the defense argued that appellant's "cognitive impairment"[2] had "a significant impact on commission of the elements of the [charged] offenses." Defense counsel claimed that mental retardation should be an exception to the "basic principle" that "all individuals are presumed to have a similar capacity for *mens rea*," citing *Bethea*, 365 A.2d at 88. Counsel argued that expert testimony "would explain, as a form of accident or mistake defense, how [appellant] was unable to understand the consequences of her actions."

The trial court granted the government's motion. The court noted that this court not only had rejected diminished ca-

pacity as a legal defense in *Bethea*, but had declined to change course in subsequent cases. *See, e.g., Doepel v. United States*, 434 A.2d 449 (D.C.1981). The court also observed that other courts with similar precedents considered evidence of mental retardation or a low I.Q. to be prohibited evidence of diminished capacity. Thus "any evidence relating to [appellant's] mental retardation or cognitive impairment would be evidence supporting a defense of diminished capacity" and "is not admissible in the District of Columbia."

#### 2. Matters Relating to Child Witnesses

Appellant moved to exclude the testimony of certain child witnesses, claiming that "improper and unduly suggestive interrogation techniques" rendered the children's testimony and statements "too unreliable to be admitted pursuant to the Fifth and Sixth Amendments." In the same motion, appellant sought discovery concerning the investigative interviews that were conducted with the children, asking the court to "conduct a hearing to determine whether the witnesses have been tainted by the conduct of their questioners, requiring that their statements be excluded from the trial."

Initially, the trial court held the request for such a "taint hearing" in abeyance. The court did not "see how the defense can make that motion without having some knowledge or more knowledge and more

---

1. Charissie Blackmond, Brianna's mother, was also named as a defendant in seven of the ten counts of the indictment. Count five charged Ms. Blackmond alone with assault with a dangerous weapon, and count nine charged her alone with being an accessory after the fact to the first-degree cruelty alleged in count seven.

Appellant's case was severed from that of Charissie Blackmond after Ms. Blackmond was determined to be mentally incompetent to stand trial. After she was found to be competent, Ms. Blackmond entered a guilty

plea in June 2002 to charges of simple assault and attempted second-degree cruelty to a child, pursuant to *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).

2. The defense asserted that appellant's I.Q. was between 60 and 69, in the "mildly mentally retarded" range, and that appellant's "thinking ability" was "significantly impaired" because of "bilateral brain dysfunction."

discovery about the case." At the same time, however, the court authorized the defense to retain an "expert on child witness issues" such as "memory susceptibility and manipulation and fabrication." The court invited the government to file a motion on the admissibility of expert testimony on these issues, which were "la[id] out ... in [defense counsel's] taint motion."

The government subsequently moved to preclude the defense from presenting expert testimony on the suggestibility of children,[3] citing *Oliver v. United States*, 711 A.2d 70 (D.C.1998) (approving expert testimony on the psychology of child sexual abuse victims and the reasons for recantation); the defense responded that such expert testimony was admissible.[4] The court ruled that "it would be proper for [the] defense to have the [expert] witness testify as to which studies say what might influence a child [such as] repeated questioning, suggestive interviews ... [and] those things that are listed in the pleading." The court reserved ruling on whether the expert would be permitted to comment specifically about the interviews in this case. However, after defense counsel filed a memorandum on the reserved issue, the defense expert was permitted at trial to give the full scope of testimony that the defense had requested, *i.e.*, testimony about child interviewing techniques generally and also about the specific interviewing techniques used in this case.

### 3. Matters Relating to Alleged Government Agency Culpability and/or Bias

The government filed a motion to preclude, under *Winfield v. United States*, 676 A.2d 1 (D.C.1996) (en banc), "an anticipated defense theory that specific individuals and various institutions other than the defendant committed the crimes charged in the indictment," including evidence that "[these] offense[s] [were] the responsibility of an institution."

The defense then moved to introduce evidence of "bias by government's agents and of the defendant's innocence and state of mind." The motion outlined the alleged failings of the government agencies involved in removing Brianna from foster care, stressing "the role that [government] agencies played in creating, failing to prevent, or otherwise turning a blind eye to the overcrowding at [appellant's home], and how that environment contributed to the death of Brianna Blackmond."[5] The motion also asserted that media attention had made government agents "eager to avoid responsibility for their actions" and had affected police officers and prosecutors, who "pressed to close the case fast with an arrest." Investigators thus allegedly "ignored and obscured the culpability of ... government agents in placing Brianna Blackmond in an overcrowded living situation and in failing to supervise her once there."[6]

---

3. The government proffered that the four child witnesses it expected to present at trial had been interviewed "by detectives, victim/witness specialists, and by Assistant United States Attorneys ... an average of three to four times over a period of nine months."

4. The defense proffered that its expert would testify "about the various kinds of suggestive interviewing techniques used in this case in interviewing children ... [and] about psychological research on the accuracy and credibil-

ity of children's reports when interviewed using those suggestive interviewing techniques."

5. The defense claimed not to be seeking to introduce *Winfield* evidence *per se*, because it was not arguing that any government agencies had committed a crime.

6. The description in appellant's brief of her own motion contains several asserted facts, derived from newspaper articles, that do not appear in the motion itself. In addition, a newspaper article that appellant claims was

The defense sought to introduce a "bias defense," consisting of evidence "tend[ing] to show that government agents deflected culpability toward [the] defendant so as to escape responsibility and produce an arrest."[7] The defense also argued for the admissibility of "third-party culpability evidence" (*i.e.*, evidence of government failings in the return of Brianna to her mother's custody and in Brianna's post-placement supervision), which "reduced" appellant's culpability and thus was "relevant to her innocence."

At a hearing on these motions, the court inquired how the defense argument was relevant to the issues in the case, namely "whether or not [Brianna] was murdered ... and, [if so,] who did it." Defense counsel responded that if government agencies had placed Brianna in a house with "too many kids," the agencies would "want[ ] to cover up their own errors" by blaming Brianna's death on a non-accidental cause. When the court asked, "How is too many children in the house a causation factor to the child falling down the stairs?", defense counsel replied, "You can't supervise all those kids." The court then ruled:

> I think we are getting very far afield.... I don't think that that argument has probative value, and you have not cited to the court any authority that will say ... that is a valid argument under the law.... In the court's view, the agency's role [in] the child returning home ... confus[es] the issues in this case. It's not probative, and I think it's

highly prejudicial to the issues in this case, and it directs attention away from what the issues are....

> I think I need to be clear to the defense that you are not going to put Child and Family Services on trial in this courtroom [in] this case.... I am ... preclud[ing] the defense from alleging that in any way agents of Child and Family Services caused her death.

> You have not laid any proper foundation to allege that they were the direct actors in the cause of her death in any way. We all know from everything that has been reported and all of the investigations that have been done of the issues regarding the return of this child to that home. But once that child was returned home, that is what this trial is about.

> It's not about what took that child to that place.... What the Child and Family Services agents did in this case did not cause the injuries to this child that resulted in this child's death. Again, the issue is solely whether or nor that child was murdered and who did it....

> I am not allowing that particular argument to be made, that agents of the Child and Family Services did not properly inspect the house, and caused a safety hazard that contributed to the child's death.

### B. *The Trial*

#### 1. *Government Fact Witnesses*

In September 1998, six-month-old Brianna Blackmond and her two-and-a-half-

---

appended to her motion was actually attached to a different motion, not at issue in this appeal, relating to a subpoena issued to the District of Columbia Child Fatality Review Committee.

7. The defense motion asked the court's permission to examine government and agency witnesses for bias. The bias theory was that "government agents had motive to minimize [their] role in creating the circumstances that [preceded] the death of Brianna Blackmond," which "affected the quality and substance of information" that was provided in the criminal investigation. The motion, however, did not specify any particular "government or agency witness" who might be subject to this line of bias examination at trial.

year-old sister, Shdiamond Blackmond, were placed with a foster family, Mr. and Mrs. Lopez. Brianna and Shdiamond spent over a year in their care, during which time Brianna learned how to crawl, walk, and climb stairs.

On December 23, 1999, a social worker called Mr. Lopez and informed him that Brianna and Shdiamond were to be returned to their mother, Charissie Blackmond. The Lopezes packed the children's belongings, and that evening social workers returned the two girls to Ms. Blackmond, who with her infant daughter lived in a row house at 52 Bates Street, Northwest, along with appellant and her five children. Appellant was Brianna's godmother.

During the next two weeks, Brianna had a lot of trouble adjusting to her new living arrangement within appellant's home. Mary Scrivener, appellant's neighbor, noticed during visits to appellant's home that Brianna did not eat, talk, or interact with others. Appellant had also mentioned to her that Brianna was not eating. Concerned about Brianna's well-being, Ms. Scrivener gave appellant Ensure, a nutritional supplement, to give to Brianna and recommended that appellant take Brianna to the hospital. It appeared to Ms. Scrivener that appellant spent more time with Brianna than Ms. Blackmond did.

Waymond Moore, Ms. Blackmond's boyfriend, also observed Brianna while she was living with appellant. Mr. Moore testified that soon after Brianna arrived, she "looked like something was wrong with her." Brianna would not play or respond to people, and on one occasion Moore saw her shaking "like she was cold." Mr. Moore recalled that appellant and Ms. Blackmond had once taken Brianna to the Hunt Place Clinic. On another occasion, Mr. Moore called an ambulance for Brianna, and when the paramedics arrived, they informed him that Brianna had a fever.

Sheila Horton West, a registration clerk at the Hunt Place Clinic, testified that she received a telephone call from Ms. Blackmond and a second woman on January 3, 2000. Ms. West had previously met Ms. Blackmond as a patient at the clinic and had known her for over ten years. Ms. Blackmond was hysterical and told Ms. West that Brianna was shaking and was not talking or eating. Ms. West instructed Ms. Blackmond to bring Brianna to the clinic that afternoon. When she arrived at the clinic after the appointed time, Ms. Blackmond informed Ms. West that Brianna was in the car and was doing better. Because she had another appointment, Ms. Blackmond said, she could not bring Brianna into the clinic, but she agreed to bring Brianna in the following day; however, she did not appear the next morning.

Appellant's sister, Marsha Washington, also expressed concern about Brianna's weight and lack of speech. She testified that Ms. Blackmond had told her that she had taken Brianna to a doctor and that "the doctor said [Brianna] would come around and talk."

Appellant's son, Aaron O'Brien (age eleven), testified that appellant had handcuffed Brianna to a stroller on January 5, 2000, to prevent her from lying on the floor. Aaron then accompanied appellant to purchase shoes for Brianna and Shdiamond. Later that afternoon, Aaron said, his mother "picked Brianna up and then she dropped her on her head on the floor in front of the ... fireplace" twice, "one after the other." Brianna's "head hit the floor" both times. Aaron's cousins and sisters and Shdiamond were all in the living room at the time. After Brianna's head hit the floor the second time, she was not moving, and her eyes were closed.

Aaron acknowledged that until just a few days before trial, he had said that Brianna had fallen down the stairs. He admitted that before the ambulance came for Brianna, appellant had instructed him to say this. On cross-examination defense counsel questioned Aaron about his differing accounts, playing multiple excerpts of Aaron's videotaped interviews on January 7 and April 11, 2000. Aaron repeatedly tried to explain that his prior account of Brianna's falling down the stairs was false:

Q. You heard three loud booms, didn't you?

A. No.

Q. Okay. Let us hear what you said on January 7.

A. I know that.

Q. What do you know?

A. I know.

Q. You know what?

A. I know what I said on the tape.

Q. Okay. Well, the jury needs to hear it. So we are going to watch what you said on January 7, 2000, okay. [Tape played.] Did you hear that boom boom?

A. Did I really hear it?

Q. Did you say it on the tape?

A. Oh, yes.

Q. That was you on the tape, wasn't it?

A. Yes.

Q. And you were referring to the sounds that you heard right before you saw Brianna on the floor.

A. Yes.

Q. And after you heard those sounds, you saw Brianna lying on the floor at the bottom of the stairs, didn't you?

A. No.

Q. And Aaron, that is when you told your mom that it was Brianna who made the noise falling, didn't you?

A. No.

Q. All right. We are going to watch what you said on 4–11–2000.

A. Okay. [Tape played.]

Q. That was you, Aaron?

A. Yes.

Q. You weren't just saying it. You were actually demonstrating where you found Brianna at the bottom of the stairs, weren't you? Weren't you?

A. Yes.

Q. And when Brianna was on the floor, your mother ran to her and picked her up?

A. You are not understanding. That didn't happen.

Q. Aaron, you need to answer the question. . . .

A. No.

On redirect, Aaron was asked to clarify his earlier testimony on cross-examination:

Q. Is what you said [on September 28, 2001] the truth or a lie? . . . That your mother dropped Brianna on her head?

A. Yes.

Q. Yes, what is it, the truth or a lie?

A. The truth.

\* \* \* \* \* \*

Q. When [defense counsel] was asking you questions, at one point you said none of this happened. Do you remember saying that when she questioned you?

A. Yes.

Q. What did you mean about that?

A. She kept saying the tapes that I, that I was saying she fell down the steps. I was trying to explain to her that none of that steps stuff happened.

Lakeisha O'Brien (age ten), Aaron's sister, testified that appellant was doing Brianna's hair on the couch[8] and that, frustrated because Brianna was moving around, appellant "got up ... off the couch, and picked [Brianna] up by her shirt and slammed her." Using a doll, Lakeisha demonstrated to the court and jury that Brianna was on the floor before appellant picked her up and dropped her, hitting her face.[9]

On cross-examination Lakeisha was impeached with her grand jury testimony and two videotaped interviews on January 7 and April 28, 2000, in which she had stated that Brianna fell down the stairs. Lakeisha admitted that she had told her aunt that her younger sister Antoinette had accidentally pushed Brianna down the stairs. Lakeisha acknowledged that her voice could be heard on the 911 call counting the steps that Brianna had allegedly fallen down and announcing that it was "five steps." However, Lakeisha insisted that those earlier accounts were false:

Q. Lakeisha, nobody hurt Brianna, did they?

A. Yes.

Q. Didn't she fall down the steps?

A. No.

Q. Huh?

A. No.

Q. She did or she didn't?

A. She didn't.

Q. What you said on the radio when you called out, that wasn't right?

A. Yes.

Q. It was right, wasn't it?

A. No.

Q: No. When you testified in front of the grand jury, you weren't telling the truth?

A. No.

Q. No?

A. Yes.

Q. You were telling the truth, weren't you?

A. No.

Q. Were you telling the truth or were you telling a lie when you testified in the grand jury?

A. Telling a lie.

Q. You were telling a lie. You took an oath, didn't you?

A. Yes.

On redirect, Lakeisha explained her earlier testimony on cross-examination:

Q. What really happened? How did Brianna get hurt?

A. My mother dropped her.

Q. Why did you tell that story all that time about her falling down the stairs then?

A. Because I was afraid.

Q. Afraid for your mommy?

A. Yes.

Q. Do you love your mommy?

A. Yes.

Tiffany O'Brien (age six) corroborated her sister Lakeisha's testimony that appellant "slammed [Brianna] on the floor" and demonstrated the action with a doll. Tiffany's testimony, unlike that of Aaron and Lakeisha, was consistent with her videotaped interview on January 7, 2000, when Tiffany stated spontaneously that "Mommy slammed Brianna" and "Brianna went to sleep." However, Tiffany also made

8. When the paramedics arrived at the Bates Street house to treat Brianna, they reported that the hair on the left side of her head was braided, while the hair on the right side was loose.

9. Lakeisha also testified that on one occasion appellant had punched Brianna in the chest.

reference to Brianna's falling "out the steps" during her January 7 interview. Tiffany made similar comments during a later interview on April 28, 2000.

On cross-examination, Tiffany reiterated her testimony on direct:

Q. After Brianna fell down the steps, what did—

A. No.

Q.—your mommy do?

A. She slammed her.

Q. Let's see what you said on April 28th about that, okay? . . . [Tape played.] . . . [D]id you see that?

A. Yes.

Q. Is that what you said about Brianna falling down the steps?

A. Yes.

Q. Yeah, and Mommy slammed her and she was asleep?

A. No, she wasn't asleep.

Q. Is that what you said there?

A. No.

Q. Well—

A. She slammed her but she wasn't asleep. She was downstairs.

Q. Okay. Is that what you said before on—in January?

A. Yes.

Q. Okay. Now do you remember what your mommy did?

A. Yes.

Q. What did your mommy do?

A. Slammed her.

On January 5, 2000, Marsha Washington's sons, Antonio (age eight) and Ricardo (age ten), spent the day at appellant's house. Antonio testified that appellant dropped Brianna on the floor several times after picking her up by her shirt. According-

ing to Antonio, appellant picked Brianna up each time, and Brianna's face was looking down.[10]

On cross-examination, Antonio acknowledged that initially he had told the police and a prosecutor that Brianna had fallen down the stairs. He also admitted that initially he reported to his mother that Brianna had been injured when Antoinette accidentally pushed Brianna on the stairs. On cross-examination, Antonio agreed that the first time he said that appellant had hurt Brianna was in a videotaped interview on October 12, 2000:

Q. Antonio, I have one more question, okay. You have to pay attention. Now, Antonio, October 12, 2000, when you first came up with the story about your auntie Angela slamming Brianna or dropping her on the floor, that was the shortest video you made?

A. Yes.

Q. And, and that was because, before you went in there, you knew what you were going to say, didn't you?

A. Yes.

Q. That is because somebody helped you come up with those words, didn't they?

A. Yes.

Q. And the word, the word slam you used on October 12, they helped with that video, didn't they?

A. Yes.

Q. Do you know what that word means?

A. Drop.

On redirect, however, Antonio denied that anyone told him what to say about the day Brianna got hurt.

**10.** Antonio also testified that appellant had spanked Brianna with a belt on her arm, back, and butt.

Paramedic Teresa Boone responded to 52 Bates Street on January 5, 2000. She testified that when she arrived, Brianna was unconscious. Boone also noticed that Brianna "had some bruising on her back and ... what appeared as some scratches [on] her face." The scratches were not bleeding and appeared to be "a day or so old." Ms. Boone positively identified the scratches on Brianna's left cheek from an autopsy photograph. On cross-examination Ms. Boone was impeached with her testimony before the grand jury, in which she said that she believed the facial scratches were on Brianna's forehead.

Dr. Shireen Atabaki was on duty at Children's Hospital in the afternoon of January 5, 2000, when Brianna was brought in. The doctor testified that Brianna was unconscious and was not breathing; her heart had stopped, there were hemorrhages behind her retinas, and she showed no sign of active brain function. Brianna's extremities were "cold and clammy." After Brianna was intubated, Dr. Atabaki was able to get Brianna's heart beating again, but Brianna was unable to breathe on her own and showed no sign of upper or lower brain function.

Dr. Glenn Stryjewski took over Brianna's care in the intensive care unit. He testified that he saw a slight red mark over her right buttock[11] and a discoloration on her right ear lobe, but he did not notice any marks on Brianna's face. A CAT scan revealed "a significant amount of blood in the brain tissue" on the left side, and bleeding under the arachnoid and dural layers of the brain on the right side. During the night Dr. Stryjewski "did literally hundreds of things to help keep Brianna's blood pressure adequate."[12] However, on the following morning, January 6, Brianna was pronounced dead.[13]

### 2. Government Expert Witnesses

Dr. Jonathan Arden, who at the time was the Chief Medical Examiner of the District of Columbia, supervised the autopsy of Brianna. An external examination revealed bruising on Brianna's right buttock and her left thigh and hip, as well as a small abrasion in the middle of her back. Additional bruising was visible on the right side of Brianna's face and chin, and there were abrasions on her left cheek. Dr. Arden, using computer-generated graphics, described the three separate areas of bruising that were discovered underneath Brianna's scalp.[14] A subdural hemorrhage[15] covered much of the surface of Brianna's brain. Additional bleeding was discovered in the subarachnoid space, just

11. The injury to the buttock was examined during a CAT scan, which revealed an edema or swelling, indicating that force had been applied to the area. From the color of the injury, Dr. Stryjewski estimated that the bruise was "a couple of days old."

12. Sometime during the night, appellant told Dr. Stryjewski that "she believed Brianna fell down four or five steps."

13. During the overnight period when Brianna was at Children's Hospital, appellant agreed to be interviewed at the Third District police station. In a videotaped statement, appellant told Detective Linda Wingate that Brianna was her goddaughter. Appellant said that she was in Charissie Blackmond's room when she heard a sound and discovered that Brianna had fallen down the stairs. Appellant also stated that, earlier in the week, Brianna had hit her head once on a metal bed post while appellant was playing with her near the bed, and a second time when Brianna fell near the fireplace.

14. One bruise was in the temple area, a second was on the side of the head above the ear, and a third was near the rear of the head.

15. The dura is a membrane underneath the skull and above the brain. A subdural hemorrhage is bleeding within this space between the bone and the brain.

below the surface of the brain. Hemorrhages were also present around the optic nerves and retinas at the back of Brianna's eyes.

Dr. Arden classified Brianna's head injuries as "blunt impact injuries" and said that the three areas of bruising "were discrete and separate impact sites." He concluded that Brianna's head injuries occurred at approximately the same time, "fairly shortly before she was presented unconscious and in need of emergency medical treatment," and that the degree of force required to cause the hemorrhaging within her head was "somewhere in the medium to extreme range of force," *i.e.*, "hard blows or substantial impacts." Dr. Arden's opinion was that the severity of Brianna's head injuries qualified medically as "child abuse," meaning that the injuries were deliberately "inflicted" and were not "accidental." [16] He considered it "very unlikely" that Brianna's injuries could have been caused by falling down stairs, because those injuries could not have been caused by "light impacts" and were not "trivial [or] casual types of injuries." In the doctor's opinion, Brianna's head injuries were "consistent with being forcibly struck or slammed into the floor." [17] Dr. Arden said that he would expect Brianna to have become unconscious immediately or shortly after the injuries were suffered. To a reasonable degree of certainty, Dr. Arden concluded that the cause of Brianna's death was "blunt impact injuries to her head" and that the manner of death was "homicide."

On cross-examination, Dr. Arden admitted that he could not "categorically exclude" the possibility that one of the impact sites could have resulted from a fall down the stairs, but in his opinion the totality of Brianna's injuries did not suggest such a fall. He noted that when a person falls down stairs, each impact "transmits energy," thereby lessening the force of subsequent impacts. When asked if the three impact sites on the head could have been caused by falling down ten steps, Dr. Arden replied:

> There may be some possibility in the universe that a fall down ten steps could cause this. Do I think it is likely? Is it my opinion that that scenario did cause this or would cause this? No. I do not find that a reasonable or likely explanation. There is probably some minute chance that a fall down ten steps could cause those injuries, but I emphasize the word "minute."

When asked the same question with respect to five steps, Dr. Arden responded:

> It is not my duty, my job, or my practice to ever exclude things with 100 percent certainty. . . . It is never 100 percent yes or 100 percent no.

---

**16.** Dr. Arden also stated that the absence of injuries to Brianna's elbows, knees, and shins—areas that typically are injured in accidental circumstances—and the unusual location of the external injuries that Brianna did have reinforced his conclusion that her injuries were not accidental.

**17.** A few moments later, the doctor testified: [I]t is noteworthy that we have three distinct impact sites fairly closely spaced on the right side of the head, which is very consistent with somebody striking the head or striking the head in quick succession there. It certainly is less consistent with tumbling or rolling.

We have several injuries that I just described for you, so I won't go over them again. But, for instance, [the injuries to] the buttock and the back of the left thigh [are] not typical for the distribution of fall-down-type injuries.

And finally . . . while certainly a child . . . may be injured falling down the stairs, the severity of these injuries tells me that that scenario is much less likely.

So, is there some slight, minute, tiny possibility on this earth that a fall down or push down five or six stairs could cause a fatal injury? I have to say there is because I don't categorically exclude things 1000 percent. But is it a reasonable explanation? Does it make sense medically? Does it go with experience? No.

THE COURT: The question is whether you have an opinion, to a reasonable degree of medical certainty, as to whether or not that could have caused the injury.

THE WITNESS: Phrased that way, Your Honor, it is my opinion with a reasonable degree of medical certainty that a fall down five or six steps would not cause these fatal injuries.

Dr. Saami Shaibani, who held a doctoral degree in material physics from Oxford University, was qualified as an expert in injury mechanisms analysis. Dr. Shaibani testified that he examined and measured the carpeted stairway in appellant's home and concluded that, given Brianna's size, the dimensions and constitution of the stairs, and the nature of her injuries, "the injuries received by Brianna are not consistent with falling down the stairs when you look at the totality." He could not "see any way" that Brianna could have received her injuries on the stairs

unless she was bodily picked up and thrown down the stairs. You would require such a large force to get not one, not two, but three separate lesions, three separate injuries on [the] head. That's something very, very unusual ... which I don't see associated with the stairs.

Dr. Shaibani based this conclusion on (1) the absence of any injury on Brianna's arms and legs, which would be expected in the event of a fall down the stairs based on "how the human body articulates"; (2) the three separate impact sites on Brianna's head, because, "generally speaking, when you would fall down ... only a few stairs ... you might hit [your head] once if you're unlucky, but not more than once on a relatively short distance"; and (3) the severity of the impact injuries, because one "would not expect ... this limited fall ... to be catastrophic." [18] In response to a hypothetical question from the prosecutor positing "a scenario where an adult grabs Brianna by the back of the shirt and slams her numerous times into the floor," Dr. Shaibani stated, "That's the easiest, most direct, most efficient way to achieve these injuries," because in that situation "the energy's got nowhere else to go."

### 3. Defense Fact Witnesses

Lillie Resper, appellant's neighbor, testified that she accompanied appellant to the Pay–Less shoe store on January 5, 2000, where appellant purchased two pairs of tennis shoes. Shervonne Walker, a foster parent for Aaron, Lakeisha, and Tiffany O'Brien during the six weeks after Brianna's death, testified that Aaron "was horrified" and "very upset," and that he cried when he saw the news coverage indicating that his mother might be a suspect. She also said that Aaron got in a fight at school with children who "teased him about his mother."

Ralik Turner, a social worker assigned to work with appellant, testified that he stopped by appellant's home on January 5 but that appellant was not at home; Charissie Blackmond, however, was there,

**18.** In discussing how he concluded that Brianna did not suffer her injuries in a fall, Dr. Shaibani said that he based his conclusion on the "laws of physics," notably including Isaac Newton's third law, "which has been well established for over 300 years, [and] which states [that] for every action there's an equal and opposite reaction."

along with approximately ten children, who all appeared to be under the age of ten or eleven. The children were "running around [and] playing all over the place," and "Ms. Blackmond was not doing a lot of caretaking."

### 4. Defense Expert Witnesses

Dr. Mark Howe, after being accepted as an expert in cognitive and developmental psychology, testified that younger children have poorer memories than older children and are more susceptible to suggestion. After viewing several excerpts from videotaped interviews conducted with Aaron, Lakeisha, and Tiffany O'Brien and Antonio Washington,[19] he highlighted examples of (1) "interviewer bias" when the interviewer "suggest[ed] to the child various things that might have happened or that might not have happened"; (2) the interviewer's "set[ting] a general tone of disbelief" or implying that "somebody [might be] in trouble" or might be "hiding something"; (3) repetitive suggestions "that they don't think that the child has told the truth"; and (4) "leading and suggestive comments" by the interviewer. Dr. Howe stated that when suggestive questioning techniques are used, "you don't know whether [an answer] really is accurate from a memory perspective, or whether they are just telling you something because they think you want to hear it."

On cross-examination, Dr. Howe conceded that none of the interviewers explicitly suggested that appellant had killed Brianna. He also admitted that a number of "good techniques" were used during the interviews seen on the videotapes, and that multiple interviews of children are not per

se improper. "If the interviews are done in an appropriate manner, you can interview as many times as you like." In addition, he agreed with the prosecutor's comment that "a distinctive event that is stressful is going to be imprinted more strongly in a child's memory than [other events.]" Dr. Howe specifically acknowledged that Tiffany O'Brien had said "Mommy slammed Brianna" at the very beginning of her first interview, the day after Brianna died, without being prompted by a suggestive question or by any improper remark. When asked if he agreed that "if a parent with whom a child lives tells that child, 'Don't talk about something,' it is going to carry a lot of weight with the child," he replied, "Absolutely." Similarly, he agreed that "it would seem to make sense" that "the more serious trouble the child thinks that a loved one may get into if they tell the truth, the more likely they would be to lie."

Dr. John Plunkett, a board-certified pathologist who serves as an assistant coroner for seven counties in Minnesota, was qualified as an expert in forensic pathology. He testified that after reviewing the autopsy report and other medical records, he concluded that Brianna's death was accidental, the result of a fall. In forming his opinion, he placed great reliance on a published study he had done of eighteen deaths of children who fell accidentally from playground equipment.[20] Dr. Plunkett's study concluded that "falls of fewer than ten feet ... may cause fatal head injury ... of a type indistinguishable from that commonly associated with what is called abusive head trauma." [21] The inju-

---

**19.** Excerpts from the tapes were played in open court.

**20.** None of the deaths in the study involved falls on carpeted or uncarpeted stairs.

**21.** On cross-examination Dr. Plunkett admitted, in response to a question from the prosecutor, that "the majority of the medical literature on falls of children supports the conclusion that falls under three feet don't

ries to Brianna's brain, he said, were "typical for those that are seen especially in a child, when the head is in motion and it stops suddenly against a [surface] such as the floor or . . . a carpeted surface." Dr. Plunkett considered it "extremely unlikely" that Brianna's injuries were caused by her head "being slammed to a hard surface" because of the absence of injury to her shoulders or upper arms. He also opined that Brianna's facial injuries were the result of resuscitation attempts or were caused by removing the tape that was holding the nasal tracheal catheter in place.

On cross-examination, Dr. Plunkett admitted that he was unaware that Aaron O'Brien had testified that "the falling down the stairs story was a lie his mom told the kids to tell," and that, in fact, "his mom had dropped Brianna on her head on the floor twice." The doctor testified that it was not unusual for someone who had abused a child to lie about her conduct and that "[g]etting the truth the first time around is an unusual occurrence." He also agreed that when children fall, "they don't usually strike their head," but he said he did now know if that principle applied on the stairs. In addition, he conceded that "it would be unlikely" for the three impact injuries on Brianna's head to have occurred simultaneously during a short fall down stairs.

Dr. Marvin Podd, who had conducted a psychological evaluation of appellant, was qualified as an expert in neuropsychology and clinical psychology. His testimony was admitted for the limited purpose of assisting the jury in deciding what weight to give appellant's videotaped statements and other statements that she made to the police. Dr. Podd testified that appellant's "IQ was in the 60s, which would be considered mildly mentally retarded." Appellant also had trouble with her memory, attention span, reading, spelling, doing math in her head, visual perception, and spatial organization. Dr. Podd stated that appellant did not believe there was anything wrong with her and that "she does not have a good understanding of what she does not understand."

On cross-examination, Dr. Podd acknowledged that appellant made it through the eleventh grade in school, has held several jobs (including one as a security officer), drives a car, and is capable of learning new things. He also conceded that appellant seemed to have the intellectual capacity to care for a child and, for instance, to teach a child "what she thought was safe and not safe."

### 5. *The Government's Rebuttal*

Dr. Shaibani was recalled to rebut Dr. Plunkett's conclusion that Brianna's death was accidental.[22] In Dr. Shaibani's opinion, it was not possible for Brianna to have sustained her buttock and head injuries during a short fall down the stairs because there was "not enough time and . . . not enough distance" for a child of her size to incur such injuries. The doctor testified that people "don't fall rigid like a matchstick" and that babies have a concentration

---

result in serious head injuries." He further acknowledged that he had never seen a report in any medical journal of a child sustaining injuries like Brianna's from a fall downstairs, unless the fall occurred in a child walker with wheels. He also agreed, again in response to a question, that "simple falls from low heights rarely result in significant brain injury."

**22.** On cross-examination, Dr. Shaibani made clear that he was not saying that short falls never result in fatal injuries, but only that "this short fall with this staircase and with this child could not have resulted in a fatal head injury."

of weight "around the middle of their body," which means that "[t]he bottom is going to lead" in a fall, and "other parts of [the] body [will] be involved" in a roll down stairs. He also said that it was possible for Brianna to have sustained an injury to the back of the head even if she was dropped face first. After an initial impact, her body and neck would "go floppy and limp," permitting injury to "any part of the head."

### 6. *The Verdict*

At the close of the government's case, the court granted appellant's motion for judgment of acquittal on the charges of conspiracy to commit second-degree cruelty to children (count one) and second-degree cruelty to a child (by failing to seek medical attention) (count five). The jury thereafter found appellant guilty of two counts of assault (lesser included offenses of first-degree cruelty to a child and assault with a dangerous weapon, respectively), one count of first-degree cruelty to a child (by striking Brianna's head against a hard surface), second-degree murder (a lesser included offense of first-degree felony murder), and obstruction of justice. From the ensuing judgment of conviction she noted a timely appeal.

### C. *The Motion for New Trial*

Almost twenty-one months after being sentenced, appellant filed a motion for new trial based on a claim of newly discovered evidence. After several responses and supplemental pleadings were filed by both parties, the trial court issued a Memorandum Opinion and Order denying the motion for a new trial without a hearing.

Appellant's motion, filed under Super. Ct.Crim. R. 33, alleged that appellant had recently obtained information that Dr. Shaibani had testified falsely at trial regarding his affiliation with Temple University. The allegation was based on a September 2003 criminal proceeding in North Carolina,[23] in which the North Carolina trial judge had granted the defendant's motion to strike Dr. Shaibani's testimony without objection and ordered the jury to disregard it. Appellant argued that, in light of the ruling in North Carolina, she was entitled to a new trial because Dr. Shaibani's testimony should have been stricken in this case as well.

The government filed an opposition to appellant's motion, to which it attached relevant portions of the *Peterson* trial transcript. In its opposition the government emphasized that the issue in *Peterson* was whether Dr. Shaibani was still representing himself in 2003 (appellant's trial took place in 2001) as being affiliated with Temple University even after he had been put on notice by that university that he was not authorized to claim such an affiliation any longer. The government also pointed out that the North Carolina court never saw certain relevant evidence that was before the trial court in appellant's case, specifically Dr. Shaibani's post–1998 reports to Temple. With respect to the government's efforts to investigate the Temple issue during appellant's trial, the government reiterated that it had done everything it could on extremely short notice.[24]

After learning of a petition for a writ of habeas corpus in South Dakota which also raised a question about Dr. Shaibani's cre-

**23.** *State of North Carolina v. Michael Iver Peterson,* No. 01–CRS–24821, 2003 WL 22965551 ("the *Peterson* case"). Dr. Shaibani testified on behalf of the state in that case.

**24.** The government asserted that appellant did not bring the matter of Dr. Shaibani's credentials to its attention until just before Dr. Shaibani was called to the stand as the last witness in the government's case.

dentials, the government filed a supplemental opposition that included the transcript and evidentiary exhibits from the South Dakota proceeding.[25] Appellant responded by filing a supplement to her motion for new trial, arguing that the South Dakota hearing transcript clearly demonstrated that Dr. Shaibani had testified falsely at appellant's trial.

In its order denying appellant's motion, the trial court concluded, first, that Dr. Shaibani had not testified falsely because "at the time of [appellant's] trial, it was reasonable for [Dr. Shaibani] to believe that he was still affiliated with Temple University since no one at Temple University had ever told him otherwise." Second, the court ruled that appellant had failed to demonstrate that the government knew or should have known of any falsity in Dr. Shaibani's testimony. Third, the court reasoned that despite the uncertainty about Dr. Shaibani's Temple University credential, the jury likely "would have reached the same conclusion, especially in light of [Dr. Shaibani's] other credentials and experience and the overwhelming independent evidence supporting Dr. Shaibani's opinions." In conclusion, the court held that "the defense had failed to satisfy any of the three prongs of the *Agurs* test,[26] and therefore is not entitled to a new trial."

## II

Appellant contends that the trial court erred in prohibiting her from introducing evidence of her mental retardation to negate the *mens rea* of the specific intent offenses.[27] She argues that mental retardation is similar to the exceptions outlined in *Bethea v. United States,* 365 A.2d 64 (D.C.1976), to the basic principle that all individuals are presumed to have a similar capacity for *mens rea,* "such as intoxication, medication, epilepsy, infancy, or senility," because these exceptions are, "in varying degrees, susceptible to quantification or objective demonstration, and to lay understanding." *Id.* at 88. Appellant also argues that most of the federal circuits permit the use of psychological testimony to negate the *mens rea* of a specific intent crime.

In *Bethea* this court was "convinced that the principles of diminished capacity should not be incorporated into our rules of criminal adjudication." *Id.* at 85; *see generally id.* at 83–92 (explaining at length the reasons behind this holding). We have consistently followed the decision in *Bethea* and adhered to its principles ever since it was decided. *See, e.g., Jones v. United States,* 386 A.2d 308 (D.C.1978), *cert. denied,* 444 U.S. 925, 100 S.Ct. 263, 62 L.Ed.2d 181 (1979), in which we held that the trial court did not err in excluding psychiatric testimony "offered to negate the specific mental state required for com-

25. *See State v. Aesoph,* 647 N.W.2d 743 (S.D. 2002).

26. *See United States v. Agurs,* 427 U.S. 97, 103–107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

27. Appellant was convicted of second-degree murder, cruelty to children, obstruction of justice, and two counts of assault. Second-degree murder, cruelty to children, and assault have no specific intent element. While a specific intent to kill may be relevant to prove the mental state required to convict of

second-degree murder, proof of that intent is not necessary to establish the requisite "malice." *See Comber v. United States,* 584 A.2d 26, 38–39 (D.C.1990) (en banc). Appellant makes no argument that mental retardation evidence should be admissible to negate heightened mental states generally (such as "wanton disregard of human life," *id.* at 39); her argument focuses only on specific intent crimes. Therefore, her diminished capacity argument would apply only to the obstruction of justice conviction.

mission of second-degree murder" because the proffered evidence "would have established ... the defense of diminished responsibility," a defense which this court has "specifically declined" to recognize. *Id.* at 312 (citing *Bethea* ). *See also Clark v. Arizona,* 548 U.S. 735, 126 S.Ct. 2709, 165 L.Ed.2d 842 (2006) (holding that Arizona rule that expert testimony about mental disease and incapacity cannot be considered in criminal cases except in the context of an insanity defense does not violate due process); *Brown v. Trigg,* 791 F.2d 598, 600–601 (7th Cir.1986) (rejecting claim that Indiana trial court's refusal to admit evidence of mental retardation, because "Indiana does not recognize a diminished capacity defense," violated defendant's "constitutional right to rebut the prosecution's proof on an element of the offense charged"). As the government points out, the *Bethea* court announced a general rule for this jurisdiction prohibiting differentiation of a defendant's intellectual abilities outside the context of the insanity defense, a rule that has not been altered either by the legislature or by this court in the thirty-two years since *Bethea* was decided. We are, of course, bound to follow the *Bethea* precedent. *See M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971). Even if we were inclined, in the abstract, to reconsider it, we see nothing in this case that would prompt us to undertake any such reconsideration, especially in light of appellant's conviction of the lesser included offense of second-degree murder rather than the charged offense of first-degree murder. See note 27, *supra.*[28]

We therefore conclude that the trial court committed no error in precluding appellant from presenting a diminished capacity defense.

## III

■ Appellant contends that the trial court erred when it denied her pre-trial request to conduct a "taint hearing" to determine whether any of the children's statements were reliable, given the allegedly relentless and suggestive questioning to which the children had been subjected. She argues that while the court allowed her to present expert testimony about suggestive interview techniques, it was insufficient because the court should have held a taint hearing first in order to determine whether the children's statements retained any indicia of reliability. *See State v. Michaels,* 136 N.J. 299, 320–322, 642 A.2d 1372, 1383–1384 (1994) (outlining procedures for a taint hearing). *But see Ardolino v. Warden,* 223 F.Supp.2d 215, 238–239 (D.Me.2002) ("[n]ot all state courts considering *Michaels*-type arguments have been inclined to follow the New Jersey Supreme Court's lead, with some declining to do so on the basis that existing rules of evidence covering witness competency adequately address the issue" (citing cases)). Appellant points out that the risks of using suggestive techniques in interviewing children have been recognized by this court[29]

---

**28.** Nor do we see any need to address the federal cases cited by appellant, given the holding in *Fisher v. United States,* 328 U.S. 463, 66 S.Ct. 1318, 90 L.Ed. 1382 (1946). In *Fisher* the Supreme Court expressly declined to interfere with the District's policy regarding diminished capacity on the ground that "matters relating to law enforcement in the District are entrusted to the courts of the District." *Id.* at 476, 66 S.Ct. 1318; *accord, Bethea,* 365 A.2d at 85. The Court in *Fisher*

noted that the refusal to recognize a "theory of partial responsibility" was firmly established in our common law: "[t]his has long been the law of the District of Columbia." *Fisher,* 328 U.S. at 471, 66 S.Ct. 1318 (citing, in a footnote, cases dating back to *Guiteau's Case,* 10 F. 161 (D.D.C.1882)).

**29.** *See, e.g., Mindombe v. United States,* 795 A.2d 39, 49 (D.C.2002) (discussing expert testimony "that children's memories can be ma-

and by the Supreme Court.[30] She concludes that in light of the testimony of the children and of her expert witness, it was reversible error for the trial court to not hold a taint hearing prior to trial. The government points out that "[a]ppellant cites no case in this jurisdiction that discusses, much less requires, such a hearing," and maintains that in any event the defense was not prejudiced by the trial court's failure to conduct a taint hearing.

While appellant did request a taint hearing in a pre-trial motion, the trial court deemed the motion premature because the defense had not received pertinent discovery. The court therefore held the motion in abeyance and invited the parties to brief the admissibility of experts on "child witness issues" and suggestive interviewing techniques. Later, after a hearing, the court ruled that appellant could present a "suggestivity" expert. When defense counsel informed the court that the government, in its response to the defense motion, had not included case law that was argued in court, the court responded:

> No. This is about the court knowing enough about this that it feels that if the government wants to challenge it on grounds that there [are] studies that this is not an art that is accepted in the scientific community, then I will have a hearing on that.

Defense counsel did not object or attempt to clarify the court's ruling. As a result, the government now argues that appellant's taint hearing claim is subject to plain error review We need not decide that

point, for we are satisfied that, under any standard of review, there is no ground for reversal.

■ The record reflects that the trial court reviewed the videotaped interviews of the children and concluded that there was no need to conduct a preliminary competency examination of any of the child witnesses. This court has emphasized the "important distinction between the competency of a child to testify and the assessment of the child witness' credibility." *Barnes v. United States*, 600 A.2d 821, 825 (D.C.1991). The competency of a child witness "is a question of law to be decided by the trial court," *id.* (citation omitted); *see Williams v. United States*, 859 A.2d 130, 135 (D.C.2004), whereas the assessment of a child's credibility "is a function for the jury." *Barnes*, 600 A.2d at 825 (citing *Robinson v. United States*, 357 A.2d 412, 415 (D.C.1976)). The trial court in this case properly instructed the jury that it "should consider the capacity of a child witness to distinguish the truth from falsehood and to appreciate the seriousness of his or her testimony when you evaluate that testimony" and that "children may be more suggestible than adults."

Finally, the trial court allowed a defense expert, Dr. Mark Howe, to testify at length, generally and specifically, about the suggestibility of children. Upon review of the record, we are satisfied that appellant had ample opportunity to assert her challenges to the children's testimony, both on cross-examination of the children themselves[31] and through the testimony of

---

nipulated by suggestion . . . and that a biased interviewer who repeatedly questions a child can be suggestive and 'add information that [did not] happen' to that child's memory' "); *see also In re Jam. J.*, 825 A.2d 902, 915 n. 7 (D.C.2003).

**30.** *See Idaho v. Wright*, 497 U.S. 805, 812–813, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990) (noting that methods such as "blatantly lead-

ing questions" and "interrogation . . . performed by someone with a preconceived idea of what the child should be disclosing" may create false or unreliable memories in children).

**31.** As we have discussed in part I–B, each child witness was impeached with his or her prior testimony.

Dr. Howe. She has not demonstrated to us that the court would have ruled differently had it conducted a taint hearing. Therefore, we find no legal error and no abuse of discretion. *See Mbakpuo v. Ekeanyanwu,* 738 A.2d 776, 781 n. 9 (D.C.1999) (trial court has "wide latitude in resolving discovery problems").

## IV

■ Appellant maintains that the trial court abused its discretion by denying her pre-trial motion to admit evidence of bias on the part of police, prosecutors, and social workers in light of the extensive media coverage surrounding Brianna's death. In support of her motion, appellant proffered numerous newspaper articles and editorials that had been written between January 2000 and September 2001, asserting that "[t]his pressure ... caused the government to repeatedly harass the children to change their statements." She now contends that "limitations on questions of motive to fabricate or shade the truth so as to deflect blame and/or culpability from a witness must 'be undertaken with the utmost caution and solicitude for the defendant's Sixth Amendment rights,'" citing *Brown v. United States,* 740 A.2d 533, 537 (D.C.1999).

The government responds with the argument that the trial court properly excluded evidence of "bias behind the investigation," including alleged errors by social services agencies and other government actors, because "[t]he trial judge is the person who can best weigh the relevancy of disputed evidence against the tendency to confuse the jury on collateral issues."

*See Mitchell v. United States,* 408 A.2d 1213, 1215 (D.C.1979). Moreover, says the government, appellant failed to proffer any evidence of a broad "institutional bias" among the agencies with an interest in the investigation of Brianna's death, and failed to identify a single person in any agency who might have misled the investigators. *See Coles v. United States,* 808 A.2d 485, 491 (D.C.2002) (bias cross-examination was properly disallowed when the proffer was "marginal at best"); *Barnes v. United States,* 614 A.2d 902, 904 (D.C.1992) (rejecting bias theory which "rested on a series of assumptions unsupported by any evidentiary proffer").[32]

Our review of the record persuades us that the trial court properly prevented appellant from converting her case into a trial on the shortcomings of the child welfare system. As the court indicated in its ruling, the trial was about appellant's culpability under the criminal law for Brianna's death. Even assuming *arguendo* that the jury might have concluded that the family court and the child welfare agencies had erred in returning Brianna to her mother's custody, such an error would not have made it any more (or less) likely that Brianna's death was the result of an accidental fall, as the defense claimed, rather than a homicide. We hold accordingly that the trial court did not abuse its discretion in ruling that the events leading to Brianna's removal from foster care were irrelevant to the issues before the jury.

■ Appellant also argues that the trial court erred in excluding evidence concerning Charissie Blackmond's previous history of neglect and mental retardation, which

---

**32.** The government also argues that appellant's assertion of bias lacks logic: "Why would the agencies look 'better' for having put Brianna into a household where she was murdered by blunt force trauma, as opposed to a household where she took a tragic fall down the stairs? Why would the 'pressure to close the case' be relieved more easily by blaming the death on an innocent person, rather than attributing it to a household accident ... ?"

supposedly rendered her incapable of providing care for Brianna and her sister Shdiamond.[33] As a result, appellant contends, she was unable to explain why she was the *de facto* parent of both children. Appellant was also precluded from presenting evidence of the child welfare agency's failure to follow up or provide services that would have further clarified any adjustment problems Brianna might have had. Such evidence, appellant maintains, was relevant and probative on the issue of motive and thus should have been admitted.

The government argues that appellant was not entitled to present her theory under the rubric of "surrounding circumstances of the offense" because those circumstances were at best "marginally relevant," and thus could be excluded if the "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *See Johnson v. United States*, 683 A.2d 1087, 1098–1099 (D.C.1996) (en banc) (quoting Fed.R.Evid. 403). This court has often held that the trial judge is the person who can best weigh the relevancy of disputed evidence against the tendency to confuse the jury on collateral issues. *E.g., Mitchell v. United States*, 408 A.2d 1213, 1215 (D.C.1979). Here the court undertook such a balancing test and ruled that the proffered evidence was not relevant and would have distracted the jury from

the issues before it. *See Hager v. United States*, 791 A.2d 911, 914 (D.C.2002) (trial judge must balance probative value of evidence against risk of jury confusion from a "trial-within-a-trial"). We are satisfied that the court met the requirements of *Johnson* and hence did not abuse its discretion in ruling as it did.[34]

## V

When Dr. Arden, the medical examiner, was asked by the prosecutor to diagnose "the totality" of Brianna's injuries, he replied:

The first more general term I have already introduced to you is blunt injury, sometimes called blunt force injury. I prefer blunt impact injury, which distinguishes it from injuries with sharp objects or gunshot injuries, things of that sort.

The other encompassing term as a medical diagnosis for her injuries would be that these are sometimes referred to in the medical jargon as non-accidental injuries. What that means, quite simply, instead of using a negative, the term that I prefer to use those is called inflicted injuries. In strictly medical terms here, this is referring to the diagnosis of child abuse.

Q. What is the diagnosis of child abuse? What does that entail?

---

**33.** The government points that "some of the evidence that appellant now claims the trial court improperly excluded was not proffered to the trial court," specifically, any showing of Charissie Blackmond's previous history of neglect and mental retardation, which would have helped to explain appellant's status as a substitute parent. However, there was evidence, as the government acknowledges, that at least two of Blackmond's children were in foster care, which would have allowed the jury to infer that she had been found neglectful or unfit as a parent in some respect. There was also evidence that Ms. Blackmond

"was an unskilled caretaker who depended on appellant's assistance." Thus, says the government, "the reasons why appellant became a *de facto* parent were not in dispute."

**34.** Even if we assume, for the sake of argument, that evidence of Charissie Blackmond's neglect might have been relevant, we note that several witnesses, including defense witness Ralik Turner, a social worker, testified about Ms. Blackmond's lack of parenting skills and the parenting role that appellant had to assume.

At this point defense counsel objected, and both counsel were called to the bench. After an extended bench conference, the court overruled the objection. The prosecutor then asked Dr. Arden to explain "what the diagnosis of child abuse is," and he replied:

> Again, speaking strictly from a medical standpoint, the phenomenon of injuries that are caused or inflicted on children generally in a caretaker setting [another defense objection was overruled here] ... is the broad generality from a medical sense of child abuse.

> It involves interpreting injuries in children as to not only what type of injury it is, but how those injuries occur, and ... when it is possible, making a medical judgment of particularly whether certain injury or injuries, either by virtue of the type of injury, the severity of the injury, the pattern of the injury represents something that was incurred accidentally versus something that was non-accidental or inflicted.

Appellant argues that the trial court erred in allowing Dr. Arden to offer this secondary diagnosis of child abuse because it was based only on his speculation that the external bruises, abrasions, and facial injuries observed during the autopsy were "intentionally inflicted" prior to Brianna's admission to Children's Hospital. She contends that Dr. Arden's testimony was contrary to the testimony of Brianna's treating physicians and was "rampant speculation," and that its admission constituted an abuse of discretion.

The government points out that appellant objected to Dr. Arden's conclusion regarding child abuse on two distinct grounds: first, that it was a legal conclusion, and second, that it was inadmissible because it went to the ultimate issue. Appellant did not object, however, on the ground that the doctor's conclusion was speculative, and thus the government now argues that this claim of error is subject to plain error review. *See Williamson v. United States*, 445 A.2d 975, 980 n. 5 (D.C. 1982). Defense counsel did make an objection, saying, "I think it is an alternate conclusion as to whether she committed cruelty to children." The trial court replied, "He can give an opinion as to causation. That is what he is here for, to tell us—the whom issue [*sic*] is whether or not these were accidental injuries or inflicted injuries. That is the key issue to this case." The court went on to explain:

> He is saying that they were inflicted, and he characterized these types of injuries as a medical diagnosis of child abuse. I don't know how that fits the ultimate issue, which is whether or not these injuries were caused by Ms. O'Brien. That's the ultimate issue that the government has to prove beyond a reasonable doubt. . . .

> That is an issue. Now, he can opine whether or not these were injuries that were deliberately inflicted. They are not if they're accidental. They are if they were inflicted deliberately. I think he can opine, given his diagnosis, on that issue, because that is the issue that these experts were called in here to examine. . . .

The court then overruled defense counsel's objection.

It is clear to us that Dr. Arden's opinion was based on all of Brianna's injuries. He outlined the three factors that informed his opinion, of which appellant is challenging only the third factor—that the distribution of Brianna's external injuries were in areas of the body that were very unusual places to find accidental injuries in children. Appellant's argument is that the doctor's conclusion was speculative because the medical records from Brianna's admission to the hospital did not note

these external injuries. According to the government, this claim was not preserved and is reviewable only for plain error. Furthermore, appellant overlooks the fact that there was indeed evidence of these external injuries. Teresa Boone, the paramedic who transported Brianna to the hospital, testified that she noticed the abrasions on Brianna's cheek, and Dr. Stryjewski, who treated Brianna in the intensive care unit, recalled that he saw red marks on Brianna's buttock and over her right ear lobe. Thus there was evidentiary support for the third leg of Dr. Arden's opinion, which took into account the location and distribution of Brianna's external injuries. Appellant has failed to demonstrate why the third factor relied on by Dr. Arden should invalidate his overall opinion—that Brianna's injuries *as a whole* were inflicted rather than accidental. We can discern no plain error, or indeed any error at all, in the court's ruling.

## VI

### A. *Appellant's Challenge during Trial to Dr. Shaibani's Testimony*

Appellant contends that the trial court committed reversible error by failing to strike the testimony of the government's expert witness, Dr. Saami Shaibani, on the ground that he had committed perjury. At trial, defense counsel challenged Dr. Shaibani's stated affiliation with Temple University as having been fabricated. Counsel's cross-examination of Dr. Shaibani included the following:

Q. In fact, isn't it true that according to the department of physics, you were not affiliated with that department at all?

A. You're asking me to speculate. I don't know what the department of physics has said. I do know what the dean has said. And I have a letter to prove it.

Q. And that was what year exactly?

A. I can't tell you exactly. I've told you approximately. In fact, if you look at my CV, it might distinguish whether it's '92, '93, '94. But it's that kind of time frame.

Q. And no one has ever raised the issue with you before concerning whether in fact you were affiliated with the department of physics at Temple University?

A. It's—I'm constantly flagged on it by necessity. If I live in Virginia and I'm a professor in Pennsylvania, people are going to say that's a little unusual, isn't it, and I say yes, but this is how it works out.

Q. And has anyone asked you under oath before if you were affiliated with the department of physics at Temple University?

A. I'm sure they must have done it. My answer then is indeed, my answer now is, yes, I am. Because I have a letter from the dean saying so.

Q. In what other cases have you testified?

A. Excuse me?

Q. What other cases have you testified under oath? You said that you testified in ten—

A. Approximately ten criminal cases and I think approximately thirty or so, twenty to thirty civil cases. So on average for the past twelve years or so, maybe two or three times a year.

Q. Okay. And you use your association—your affiliation with Temple University?

A. I don't use it. I just—if people ask me do I have that affiliation, my answer is yes.

Q. In fact, on your resume you list an affiliation with Temple University?

A. But not as my primary thing. In fact, the first thing on my resume is that I'm an independent consultant.

Q. Your resume lists your affiliation with Temple University; is that right?

A. Among other things, yes, ma'am.

Q. And isn't it true, Dr. Shaibani, that the—that Temple University has absolutely no record of employment by you, either as a part-time, full-time, or any other kind of instructor there for the last fifteen years?

A. That's correct. Because when I was appointed by the dean, it was an unpaid position. I was asked to promote the school through my academic and scholarly research. I was supported by grants from Temple University for a number of years. That hasn't happened particularly recently. But Temple University Medical School used to pay me to go all around the country to present results on behalf of Temple University. I taught people as someone associated with Temple University.

Q. And how long—what's the most recent grant funding that you received from Temple?

A. It's been a number of years. I couldn't tell you when the grant funding ran out. It's certainly not current.

Shortly after this exchange, defense counsel presented at the bench a letter dated September 27, 2001 (about three weeks before trial), from Dr. Edward Gawlinski, chairman of the physics department at Temple University, in support of her challenge to Dr. Shaibani's testimony. The court denied counsel's request to impeach Dr. Shaibani with the letter because it was hearsay.[35]

According to counsel's proffer, Dr. Gawlinski stated in his letter that Dr. Shaibani had never been a "clinical professor of physics" at Temple as he claimed to be, and that no such title even existed at the school. The letter said that Shaibani possibly had been an "adjunct" professor at Temple "for a period of one to two years sometime during the early 1990s," but according to Dr. Gawlinski, Temple had no "documentation confirming this appointment." Dr. Gawlinski further declared that any "claim by Mr. [*sic* ] Shaibani that he is now a member of, or even affiliated with, the Temple University Department of Physics is fraudulent," noting that "at least once a year [he had] to write this sort of letter."

A couple of days later, the trial court delayed its decision on defense counsel's *ex parte* request to serve subpoenas on several faculty members at Temple University because Temple's general counsel was still investigating whether Dr. Shaibani's appointment had been renewed. The court also asked the government to produce the appointment letter. The following day, outside the presence of the jury, the court heard argument from both counsel on the question of his renewal, and concluded: "It sounds to me like Temple has got different people who are talking different things, and they are all over the place with their

---

**35.** Defense counsel also raised an objection to Dr. Shaibani's being qualified as an expert, based on the doctor's lack of memory regarding his appointment and reappointment at Temple University. The court overruled the objection:

> Injury mechanism analysis is what he's been asked to qualify in, an area that you did not [even] touch with him [during voir dire]. . . . If you think that that is what the record reflected, that that is his sole basis for his experience, the time you spent on Temple University, then we're not sitting in the same courtroom. Because that is not accurate.

designations and who says what ... and who communicates what, and what in the academic world is affiliated versus not affiliated. I think it's kind of loose."

During its rebuttal case, the government, through Dr. Shaibani, was able to produce a formal letter of appointment issued by Temple (through Carolyn Adams, then the Dean of Temple's College of Arts and Sciences) to Dr. Shaibani, and countersigned by Dr. Shaibani, which was admitted into evidence. This letter established that in 1995 Dr. Shaibani had in fact been appointed to an unpaid three-year term as a "Clinical Associate Professor in the Physics Department" at Temple. The formal letter directly contradicted Dr. Gawlinski's letter, which had "assure[d]" defense counsel that the position did not exist. It was also undisputed that Dr. Shaibani fulfilled his responsibilities in that position through independent research, writing, and teaching (for which Temple received credit as part of Dr. Shaibani's biographical details), and that Dr. Shaibani's affiliation with Temple did not require him to teach classes at Temple or to perform research there. It was also undisputed that Dr. Shaibani had been a research fellow at Temple University Medical School (Conemaugh Hospital) for four years beginning in 1992.

In the end, the only issue left unresolved was whether Dr. Shaibani's three-year appointment as a clinical professor at Temple had been renewed beyond August of 1998. Dr. Shaibani testified on direct examination during the government's rebuttal:

Q. Now, was it renewed in any way, your clinical appointment there, with Temple?

A. Yes, sir, it was.

Q. How, in writing or orally?

A. Orally from the dean's office, sir.

Q. Did you ever get anything in writing from Temple thereafter that reiterated that reappointment?

A. It was kind of a handshake, a gentlemen's agreement sort of thing.

Q. Did you do anything to keep Temple informed of what you were up to?

A. Oh, yes. Every year or every other year I would write to my dean and to my chairman explaining what research I had been conducting. I also mentioned that I had appeared in Newsweek magazine with my Temple affiliation reported there. That was last year. And it was wonderful to be able to fly the Temple flag, so to speak, because my affiliation with that school is something that I think we both benefit from.

Q. I'm going to show counsel what's been marked for identification as Government's Exhibits 194, 195, and 196 and 197. Dr. Shaibani, I'm going to hand you Government's Exhibits 194, 195, 196, and 197. Can you tell us what those are as a class, please, as a group?

A. These are copies of letters that I've written over the past several years to my dean and my chairman at Temple University, sir.

Q. And do they relate at all to your previous answer that you wrote to them keeping them informed as [to] what you were doing?

A. Yes, sir, either every year or every other year, depending on the type of research that I was undertaking at the time.

Q. The most recent one of those is when?

A. Both Exhibits 196 and 197 are as recent as last year, sir.

Q. Did you do a letter like that this year to Temple?

A. No, I've got into the—for the first several years I did it every year. Now that my position is essentially permanent, I'm doing it every other year.

Q. Now, the copies that we marked as exhibits, do they bear your signature?

A. No, sir, they're just my office copy, sir.

Q. Were the originals sent to the folks to whom they were addressed?

A. Yes, sir, both to my dean and my chairman.

Q. Were they signed, the originals that you sent off?

A. Yes, sir.

Q. Are those copies something you kept as part of your business records?

A. Just in the normal course of events, yes, sir.

[THE PROSECUTOR]: Your Honor, I'd offer Exhibits 194, 195, 196, and 197 into evidence.

THE COURT: Defense position? Same as before?

[DEFENSE COUNSEL]: Yes, Your Honor.

THE COURT: They're admitted.

Q. [by the prosecutor]: Doctor, after you sent the letters that you just testified about, did you hear anything back from either of the people to whom you addressed them, either orally or in writing?

A. No, sir. I just imagined they put it in my file there.

Q. Thank you. I'll retrieve those. When you sent those letters off, did you ever get the originals back as being undeliverable or anything like that?

A. No, as I said, I just assumed they were put in my file there.

Thereafter, on cross-examination, defense counsel thoroughly questioned Dr. Shaibani about his understanding of the renewal of his appointment:

Q. In fact, under that letter your relationship with Temple expired in 1998; didn't it?

A. In the first instance, yes, ma'am.

Q. So in order to show a renewal of your appointment, you would need to get another letter; wouldn't you?

A. No, ma'am. When I spoke to them, they said we've had such a good time for the first three years, let's just continue with the work and have done with it.

Q. In fact, who was the "they" that you spoke to?

A. It was a senior assistant in the dean's office. I believe it was a woman. I couldn't tell you her name. I initiated the renewal about ten months earlier. I wrote to my chairman in November of the previous year, ten months before the expiration the following year. And it just went backwards and forwards between the department and the college, the college and the department. In the end they said let's just continue.

Q. And, in fact, in the end they didn't give you a renewal; isn't that right?

A. No, I've just said the opposite. They renewed it permanently.

Q. In fact, you have no letter of renewal or no letter of appointment from Dr. Gawlinsky in the physics department or dean of the college of arts and science?

A. The dean's office told me—

THE COURT: Just a minute. The question is, do you have a letter from those individuals. That's not something you have to explain.

THE WITNESS: Okay, sir, I don't have a letter. They told me verbally.

Q. Well, Dr. Gawlinsky didn't tell you verbally, did he?

A. He is only my chair.

THE COURT: The question is, did he tell you verbally?

THE WITNESS: Sorry, sir.

THE COURT: Answer the specific question.

A. No, Dr. Gawlinsky, as my chairman, didn't tell me.

Q. And the dean of the college of arts and sciences did not tell you verbally; is that right?

A. One of her senior assistants did, but not herself.

Q. The dean of [the] college of arts and sciences did not tell you verbally or in writing that you had a renewal, correct?

A. That's correct.

Q. And only the dean of [the] college of arts and sentences [*sic*] can issue a renewal; is that right?

A. The dean and not the chair, that's correct.

Q. So it would only be the dean who could issue a renewal?

A. The dean's office, I think, would be a fair description, rather than the dean herself, if she's delegated that.

Q. In fact, this letter—the original letter was signed by the dean; correct?

A. Correct, but that's for starting. When you continue—

THE COURT: Excuse me, I don't see the need to always explain. Answer the question. Next question, please.

THE WITNESS: I'm sorry. I'm just trying to be helpful.

THE COURT: It would be helpful if you just get done with the testimony.

THE WITNESS: All right.

THE COURT: Go ahead, please.

Q. There is no letter of reappointment from the dean, correct?

A. That's correct.

Ultimately, the government agreed to enter into a stipulation that "there was no written [re]appointment made to him." Defense counsel, however, never offered such a stipulation into evidence.

Appellant now claims that the government violated her due process rights because it knew that Dr. Shaibani's testimony regarding his employment at Temple University was false. Proceeding from that premise, appellant contends that Dr. Shaibani's testimony regarding his expertise was also false. She further maintains not only that the government failed to conduct a sufficient investigation of defense counsel's allegations of perjury on the part of Dr. Shaibani, and that the government knew or should have known about the perjury, but that there was a reasonable likelihood that Dr. Shaibani's allegedly false testimony affected the judgment of the jury. *See United States v. Agurs*, 427 U.S. at 103, 96 S.Ct. 2392.

The government responds, first, that Dr. Shaibani did not perjure himself. Second, the government argues that even if Dr. Shaibani's testimony regarding his reappointment was false, there is nothing in the record to suggest that the government knew or should have known about it. Furthermore, the government contends that Dr. Shaibani's testimony was not substantially different from that of Dr. Arden, aside from the fact that Dr. Arden emphasized that was not his "practice to ever exclude things with 100 percent certainty." Both doctors were in agreement that it was unlikely that Brianna sustained her injuries from a fall down the stairs. Therefore, the government maintains that there was no reasonable likelihood that Dr. Shaibani's testimony regarding his affiliation with Temple University, even if it was false (which the government disputes), would have prejudicially affected the jury's verdict.

## B. *The Motion for New Trial and the South Dakota Hearing*

Appellant appeals separately from the trial court's denial of her motion for new trial. She claims that the court abused its discretion in denying her motion on the ground that she had failed to show that her newly discovered evidence established perjury on the part of Dr. Shaibani, that the government knew or should have known about his perjury, and that there was a reasonable likelihood that his supposedly perjured testimony could have affected the verdict. She places great reliance on the record from the South Dakota hearing, which—in her view—demonstrates that Dr. Shaibani lied when he said he was affiliated with Temple University after 1996 and that his testimony about his clinical experience at Temple with trauma victims and their physicians was false. Specifically, appellant contends that Dr. Shaibani's testimony in South Dakota cannot be reconciled with his testimony at trial in this case that he spent "over 80 percent of [his] time" consulting with his medical colleagues as part of his work as a clinical professor at Temple.[36]

Appellant also maintains that the trial court abused its discretion when it ruled, in light of Dr. Gawlinski's letter disputing Dr. Shaibani's claim that he was an associate clinical professor in Temple University's physics department, that appellant had failed to prove that the government knew or should have known about Dr. Shaibani's allegedly false testimony. Appellant's contention is that once the government was presented with Dr. Gawlinski's letter, it had an affirmative duty to investigate specific, non-trivial *Brady* requests.[37] Instead, she asserts, all that the government did to investigate the matter was to inquire of Dr. Shaibani in private to determine whether he was still affiliated with Temple University.

Finally, appellant argues that the court abused its discretion when it concluded, in its order denying her motion for new trial, that there was no reasonable likelihood that Dr. Shaibani's allegedly false testimony affected the verdict. She maintains that the trial court's statement that Dr. Shaibani was qualified as an expert witness and would have been permitted to testify as an expert, even without his (supposedly non-existent) Temple credentials, was not supported by the record.[38]

36. At trial, defense counsel posed the question, "Now, did you say that you work with doctors on a day-in-and-day-out basis?" Dr. Shaibani replied:

In part of my responsibilities as a clinical professor, physicians consult with me and say, can I explain how a particular injury got caused because the circumstances reported to them don't add up. When I say that I work on a day-in-day-out basis with physicians, I'm regularly writing scholarly articles. And I may phone a colleague and say, can you clarify some aspect for me because I don't have complete information, can you give me some perspective. I sometimes write scholarly articles with my colleagues.

So when I say day in day out, I mean it's a major part of my everyday life. I can't tell you every day this week that I've spoken with a medical colleague. But more often than not I will. I will say that *over 80 percent of my time*, directly or indirectly, related to my responsibilities as a clinical professor and working in that kind of environment where I'm doing research and publishing papers, whether I get paid for it or not. [Emphasis added.]

37. *See Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

38. Specifically, appellant asserts that, contrary to the trial court's finding that he was not a clinical professor at Temple University after August 31, 1998, Dr. Shaibani testified at the South Dakota hearing that he left the clinical professor position in late 1995 or early 1996. Moreover, she states, although Dr. Shaibani testified at trial that he had previ-

During the South Dakota hearing, Virginia Flick, an associate university counsel for Temple University, testified that she had been ordered during the North Carolina case to provide documents that pertained to Dr. Shaibani, but because Temple never had a file on Dr. Shaibani, "it was like looking for a needle in a haystack." Ms. Flick was able to locate the original appointment letter that was admitted into evidence at appellant's trial.[39] In addition, she produced a letter dated August 5, 1995, from Dr. Shaibani to Dean Adams, in which he accepted the dean's "gracious invitation ... to become clinical associate professor" in the physics department. Ms. Flick provided copies of other correspondence between Dean Adams and Dr. Shaibani between 1996 and 1999 in which Dr. Shaibani informed Dean Adams of his work and referred to her acknowledgment of that work.

Appellant points out that at the South Dakota hearing Ms. Flick also testified (1) that the title "clinical associate professor" was used only by the medical school and not the physics department, and that Dr. Shaibani's appointment was requested by Dr. Kolff, an official at Conemaugh Hospital; (2) that Dr. Kolff told her Dr. Shaibani was terminated within a few months of receiving the courtesy appointment as a result of questionable expenses; and (3) that Temple University requires all appointments to be in writing, and that there was no documentation that Dr. Shaibani conducted any off-campus nationwide seminars on behalf of Temple. According to Ms. Flick, a review of Temple records showed that, as of 2000, Dr. Shaibani was "not affiliated in any way with Temple or appointed to our faculty in any capacity." When asked if it would be "possible under the rules and regulations of Temple" for Dr. Shaibani to have received a permanent appointment that was not in writing, Ms. Flick replied, "It would not be possible. It would not have occurred." Finally, Ms. Flick stated that Temple had taken no legal action against Dr. Shaibani.

---

ously taught physics at Virginia Tech University, he never claimed that that basic physics course related to trauma or to his trial testimony. The trial court's finding that "he has conducted a significant amount of research and publication in the field of injury mechanics" is, in appellant's view, unsupported by the record, given Dr. Shaibani's admission at the South Dakota hearing that he had virtually none of the clinical experience with trauma victims about which he had testified at appellant's trial. According to his trial testimony, his research and writing was all related to his work with patients as a Temple clinical professor. Since his claim to be a Temple clinical professor since 1996 was not true, appellant argues, *a fortiori* he was not doing research based on that work from 1996 to 2001.

39. Ms. Flick also found an undated letter from Jack Kolff, chairman of surgery at Conemaugh Hospital, to the chairman of the physics department at Temple, asking for assistance in conferring the title of Clinical Associate Professor of Physics on Dr. Shaibani. Dr. Kolff wrote that the title would be conferred "in recognition of the contributions made by [Dr. Shaibani] in the application of physics to medicine." Dr. Kolff noted that Dr. Shaibani was "in his tenth year as a physics professor," had "given numerous scholarly lectures and presentations," and "ha[d] the ability to make detailed concepts from physics accessible to nonspecialist audiences." With his letter Dr. Kolff enclosed "supporting materials to demonstrate the research conducted by Dr. Shaibani in the diverse roles that physics plays in trauma, physiology, and other medical fields."

Furthermore, Ms. Flick identified a letter dated January 23, 1995, addressed to Carolyn Adams from the then-dean of the physics department, Dr. Tahir Kheli, who was seeking assistance from Dean Adams in responding to Dr. Kolff's request. The letter bears a handwritten note at the bottom, written by Dean Adams to an assistant ("Mary"), asking what "choices" they had "in assigning an honorary title" to Dr. Shaibani "on a more-or-less permanent basis."

At the South Dakota hearing, Dr. Shaibani testified that he began working at Conemaugh Hospital in 1992, at the invitation of a friend, under the title of "principal research fellow." Dr. Shaibani denied that he had been terminated from Conemaugh in 1996, insisting that the decision for him to leave had been mutual. After leaving Conemaugh, he said, he "spent nearly all [his] time" in his position as clinical professor of physics.

In November 1997 Dr. Shaibani called the office of the Dean of the College of Arts and Sciences and had a conversation, a few minutes in length, with a staff person (who may have been named Mary). When he asked about the reappointment process, he was directed to contact the chairman of the physics department, Dr. Gawlinski. Dr. Shaibani then wrote to Dr. Gawlinski asking him to write to Dean Adams and recommend that he be reappointed for an additional three years. After receiving no response from Dr. Gawlinski, Dr. Shaibani called the Dean's Office again on July 20, 1998, and the person who answered the phone told him that the office would follow up on the status of his reappointment.[40] On August 10 Dr. Shaibani called the Dean's Office again, and the woman who took the call told him that "they still hadn't heard from the Physics Department" but that she would follow up.[41] On August 21 Dr. Shaibani spoke to a person in the physics department, who informed him that he or she was aware that the Dean's Office was waiting to hear from the department about the reappointment and that the person would inquire further.

On August 31, 1998, Dr. Shaibani called the Dean's Office and informed the person with whom he spoke that this was the last day of his appointment, and that he was facing deadlines for submitting papers and "did not want to put Temple University's name down as an academic affiliation in the papers ... unless you give me the green light." According to his South Dakota testimony, "the person said go ahead." From that conversation, Dr. Shaibani understood that once the physics department "signed off," his renewal would be permanent. He waited for a confirmatory letter, but when he did not receive one, he just "assum[ed] they were happy to continue informally."[42] Dr. Shaibani continued to write letters in 1999 and 2000 reporting on his activities and continued to identify himself with Temple on his papers and at conferences. He testified that Temple must have known that he was still identifying himself as someone affiliated with the university because "it was out there in plain view in the public domain."

When asked if he was currently affiliated with Temple, Dr. Shaibani testified that he was not. Ms. Flick's letter of September 25, 2003 [43]—which was first disclosed to Dr. Shaibani during the *Peterson* trial in North Carolina—contradicted his understanding of his affiliation with Temple, and Dr. Shaibani thought it would be "foolhardy" to ignore it. After seeing that letter, Dr. Shaibani did not assert any affiliation

**40.** Dr. Shaibani presented copies of his pertinent phone records at the South Dakota hearing. The conversation with the Dean's Office on July 20, 1998, lasted 1.7 minutes.

**41.** According to Dr. Shaibani's phone records, the August 10 conversation lasted 5.3 minutes.

**42.** Dr. Shaibani said he had previously worked for two years at Lynchburg College and for two or three years at Virginia Tech "without a contract [and] on a handshake." He testified: "Things in academia are more informal. So the original appointment letter in 1995 was the exception, not the rule."

**43.** This was almost two years after appellant's trial, which took place in October 2001.

with Temple and did not include Temple's name on any of his published papers.

Dr. Shaibani also testified at the South Dakota hearing about his contact with medical patients. After he left Conemaugh in 1996, he would still go to doctors' offices or clinics, but only "on a short-term basis." He estimated that there were "probably more than twenty" occasions since 1996 when he had visited a clinic or a doctor's office to see patients and to consult. When he was asked about his testimony in prior trials that being a "clinical professor" meant "dealing with patients on a day-in, day-out basis" and involved "real people in the real world," he explained that "dealing with patients" to him did not always mean "seeing the patient," but could also mean studying patient files or consulting with physicians. He also noted that in one visit to a pediatrician's office, he "would see thirty, forty, fifty patients [on] that one day."[44]

In her appeal from the denial of her motion for new trial, appellant argues that the trial court abused its discretion in denying the motion in light of recent developments—in particular, the South Dakota hearing—concerning Dr. Shaibani's credentials. She contends that the government's failure to conduct a more thorough investigation of Dr. Shaibani's credentials violated her due process rights, thus entitling her to a new trial under *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), and *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Appellant also maintains that the trial court disregarded her arguments concerning the testimony of

Ms. Flick and Dr. Shaibani at the South Dakota hearing which contradicted his trial testimony.

### C. *Discussion*

▮ This court "review[s] a decision to deny a motion for new trial for abuse of discretion." *Geddie v. United States*, 663 A.2d 531, 533 (D.C.1995). In conducting such a review, we must determine "whether the decision maker failed to consider a relevant factor, whether he relied upon an improper factor, and whether the reasons given reasonably support the conclusion." *Johnson v. United States*, 398 A.2d 354, 365 (D.C.1979) (citation omitted). An abuse of discretion may occur when the decision of the trial court "rested on a foundation rendered legally infirm by the omission of relevant factors." *Williams v. United States*, 884 A.2d 587, 603 (D.C. 2005).

▮ While a prosecutor "may not knowingly present false evidence or permit evidence, known to be false, to go uncorrected," *Hawthorne v. United States*, 504 A.2d 580, 589 (D.C.1986) (citations omitted), relief is not automatic even if the government knowingly presents false evidence. Instead, a new trial is warranted only "if there is 'any reasonable likelihood' that evidence known by the government to be false could have affected the jury's verdict." *Keys v. United States*, 767 A.2d 255, 261 (D.C.2001) (citations omitted); *see Agurs*, 427 U.S. at 103, 96 S.Ct. 2392; *Napue*, 360 U.S. at 271, 79 S.Ct. 1173; *Mooney v. Holohan*, 294 U.S. 103, 112–113, 55 S.Ct. 340, 79 L.Ed. 791 (1935); *Woodall v. United States*, 842 A.2d 690, 695 (D.C. 2004);[45] *Hawthorne*, 504 A.2d at 589–590.

---

44. Additional documents admitted into evidence in the South Dakota hearing included notarized copies of Dr. Shaibani's four degrees from Oxford University, his Virginia teaching license and postgraduate professional license, various professional licenses from the United Kingdom and other countries in Europe, and Dr. Shaibani's license as a "professional engineer" in the District of Columbia.

45. We said in *Woodall* that reversal is required "unless there is no reasonable possibil-

"Contradictions and changes in a witness's testimony alone do not constitute perjury and do not create an inference, let alone prove, that the prosecution knowingly presented perjured testimony." *Matthews v. United States,* 629 A.2d 1185, 1201 (D.C. 1993) (quoting *Tapia v. Tansy,* 926 F.2d 1554, 1563 (10th Cir.1991)).

Thus, in order to succeed on a *Napue* claim, appellant must demonstrate (1) that the prosecutor presented false testimony, (2) that the prosecutor knew or should have known it was false, and (3) that there is a reasonable likelihood that the perjured testimony could have affected the verdict. *See Card v. United States,* 776 A.2d 581, 602 (D.C.2001). It is worth noting that in *Agurs* the Supreme Court did not extend *Napue* and *Mooney's* "strict standard of materiality" beyond a situation involving the "knowing" use of perjured testimony. *See Agurs,* 427 U.S. at 103–104 & nn. 8–9, 96 S.Ct. 2392.[46]

We hold that appellant has not met her burden under *Napue* and *Mooney* of proving that Dr. Shaibani testified falsely at her trial.[47] Perjury is a "willful assertion as to a matter of fact, opinion, belief, or knowledge" made by a witness under oath that is "material to the issue or point of inquiry and known to such witness to be false." *Brooks v. United States,* 396 A.2d 200, 205 (D.C.1978). Appellant fails to demonstrate perjury under *Napue* because she cannot prove that Dr. Shaibani's reliance on the oral assurance he received from the Dean's Office was unreasonable. We find it significant that he continued to correspond with Temple University after 1998 and continued to identify himself as affiliated with Temple in published papers and articles, and that Temple never told him to stop, at least before 2003. Appellant has not presented any evidence that, prior to Dr. Shaibani's trial testimony in this case (in 2001), Temple University at any time requested him to stop identifying himself as being affiliated with Temple. At most, Dr. Shaibani's belief that Temple had renewed his affiliation may have been mistaken, but appellant has not shown that his testimony was knowingly false and therefore perjured. *See Fuchs v. Aronoff,* 46 A.2d 701, 704 (D.C.1946) ("[t]he mere falsity of a statement does not warrant an imputation of willful perjury, where it might reasonably have been the result of a

ity that the falsehood affected the jury's verdict." 842 A.2d at 696 (citing *United States v. Bagley,* 473 U.S. 667, 678–679 n. 9, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). However, in a footnote we observed that "[a]s footnote 9 of *Bagley* makes clear," there is "no substantive difference" between this formulation and the alternative language used in other cases— such as *Agurs,* 427 U.S. at 103, 96 S.Ct. 2392—that reversal is required if "there is any reasonable *likelihood* that the false testimony *could* have affected the judgment of the jury." *Woodall,* 842 A.2d at 696 n. 6 (emphasis added in *Woodall* ).

**46.** The government argues that *Giglio* cannot be read as an extension of *Napue* either, because *Giglio* was a *Brady* case in which the focus was not on the presentation of false testimony, but on the government's non-disclosure of promises of leniency to one of its witnesses and the potential impact of the withheld information on that witness' credibility. *See Giglio,* 405 U.S. at 154–155, 92 S.Ct. 763. The later decision in *United States v. Bagley, supra* note 45, makes clear that the Court still sees the *Napue* materiality test as applying to the limited situation of testimony known by the government to be false. *See Bagley,* 473 U.S. at 679 & n. 9, 105 S.Ct. 3375 (Blackmun, J.) (discussing *Napue* as it applies to the "knowing use of perjured testimony").

**47.** Appellant asserts that Dr. Shaibani testified falsely about four matters: (1) that he continued to have an affiliation with Temple University after 1998; (2) that he was at one time supported by grants from Temple University; (3) that he conducted off-campus seminars for Temple; and (4) that he worked on a day-to-day basis with doctors.

mistake"). Appellant, in other words, has not shown that the trial court's "factual finding that [Dr. Shaibani's] testimony was not false" was clearly erroneous and "wholly unsupported by the evidence." *See United States v. Hoffecker*, 530 F.3d 137, 183 (3d Cir.2008) (citations omitted).

With respect to Dr. Shaibani's testimony about his day-to-day contact with doctors, appellant mistakenly interprets his testimony in South Dakota that he had no medical colleagues at Temple University after the winter of 1996 as contradicting his trial testimony that he spent "over 80 percent of [his] time" consulting with medical professionals as part of his duties at Temple. The government points out in its brief that Dr. Shaibani never testified that he spent "80 percent of his time" teaching at Temple or working with Temple doctors. Rather, what he said was that "over 80 percent of [his] time, directly or indirectly, relates to his responsibilities as a clinical professor" and that, as part of those responsibilities, he would routinely consult with "physicians"—his "medical colleagues"—in connection with "scholarly articles." Dr. Shaibani published those "scholarly articles" with Temple's name on them as a result of his relationship with Temple. We therefore see no inconsistency between Dr. Shaibani's testimony at the South Dakota hearing with his testimony at appellant's trial. At the very least, even assuming such an inconsistency, we do not see how it would rise to the level of perjured testimony.

■■■■ Appellant is mistaken when she characterizes the government's failure to investigate her challenge to Dr. Shaibani's credentials as a *Brady* violation. *Brady* applies only to information in the government's possession. *See, e.g., Guest v. United States*, 867 A.2d 208, 211 (D.C. 2005). It imposes a "duty to learn of any favorable evidence known to others *acting*

*on the government's behalf* in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (emphasis added). *Brady* is not implicated here because Dr. Shaibani was neither a police officer nor any kind of government agent, nor is Temple University a government agency "closely aligned with the prosecution." *United States v. Brooks*, 296 U.S.App. D.C. 219, 222, 966 F.2d 1500, 1503 (1992). Nor did *Brady* impose any obligation on the government to search through Temple's files and records in order to resolve any uncertainty about Dr. Shaibani's affiliation with Temple. *See Lewis v. United States*, 393 A.2d 109, 115 (D.C.1978) (*Brady* does not require a prosecutor "to investigate—and come to know—information which the defendant would like to have but the government does not possess").

■■■ Moreover, even assuming that the government should have been more diligent before trial in confirming Dr. Shaibani's claim of affiliation, appellant has failed to demonstrate that the allegedly false testimony of Dr. Shaibani could in any reasonable likelihood have affected the verdict of the jury. On this point we are guided by (among other cases) our decision in *Whitley v. United States*, 783 A.2d 629 (D.C.2001). The trial judge in *Whitley* denied a motion for new trial which was based on newly discovered evidence that a police detective, who testified for the government as an expert witness in a drug case, falsely testified that he had earned a pharmacology degree. We affirmed that denial, holding that the appellant had failed to show that a new trial would have produced an acquittal. *Id.* at 635–636.

This case, of course, takes us a step or two beyond *Whitley*, which was governed by a lesser standard of review. In *Whitley*, which involved a motion for new trial under Criminal Rule 33, we had to decide

only whether the newly discovered evidence "would have" led to a different outcome. In the instant case, however, we cannot affirm "if there is any reasonable *likelihood* that the false testimony *could* have affected the judgment of the jury." *Agurs,* 427 U.S. at 103, 96 S.Ct. 2392 (footnote omitted; emphasis added). But even under this more stringent standard, required by *Mooney* and *Agurs* (and several other cases), we are not persuaded that reversal is warranted.

The factual questions concerning Dr. Shaibani's status at Temple, and the issue of Dr. Shaibani's credibility concerning that subject, were aired extensively before the jury, but the jury nevertheless found appellant guilty. In its order denying the motion for new trial, the trial court concluded that it would have qualified Dr. Shaibani as an expert even in the absence of a continuing affiliation with Temple University,[48] and there was no reasonable likelihood that the absence of that particular credential could have affected the jury's assessment of Brianna's cause of death. *See Karamychev v. District of Columbia,* 772 A.2d 806, 812 (D.C.2001) (trial judge "is in the best position to evaluate the qualifications of an expert witness"). Moreover, we cannot find fault with the court's reasoning that even if Dr. Shaibani had not testified at all, there was no reasonable likelihood of a different verdict, given the eyewitness testimony, Dr. Arden's testimony, and the weakness of the defense evidence (including what the court called the "novice and almost incompetent"

impression conveyed by the defense's expert witness on cause of death, Dr. Plunkett). For these reasons, we have no basis for concluding that the verdict of the jury could have been affected by allegedly false testimony from Dr. Shaibani about minor matters concerning his credentials.

On a related point, appellant claims that the trial court violated her Fifth and Sixth Amendment rights by precluding her from calling certain officials from Temple University to testify. She argues that the letters from two of these officials which she proffered were sufficient to reach the threshold requirement of relevance, and that the court abused its discretion in not allowing her to present witnesses who would testify that Dr. Shaibani was not employed at Temple. Since his employment at Temple was—she maintains—the basis of his "clinical experience," the court would have been required to strike his testimony. The record does show that defense counsel's stated purpose in seeking to call the Temple witnesses was to impeach Dr. Shaibani. But their proposed testimony did not directly contradict his testimony, and the court had already admitted into evidence other documents, as well as testimony from Dr. Shaibani himself, that conveyed to the jury the same information. On this record we find no abuse of discretion.

Finally, we take note of a recent case from the Supreme Court of Wisconsin involving the same Dr. Shaibani. In *State v. Plude,* 310 Wis.2d 28, 750 N.W.2d 42 (2008), the court reversed a murder convic-

---

**48.** The record makes clear that Dr. Shaibani's expertise came not from his supposed affiliation with Temple University, but from his educational background, the substance of the studies he had done, and the papers he had written and published. Dr. Shaibani testified that he (1) had worked with medical colleagues at Oxford to study the mechanics of injuries; (2) possessed a medical patent dealing with the diagnosis of traumatic injuries; (3) had written more than seventy papers and articles on injury-related topics (including one paper for which he had collected data on the dimensions of the bodies of young children); and (4) regularly gave lectures about injury mechanisms analysis at events such as meetings of medical and scientific societies.

tion after concluding that Dr. Shaibani, who testified as an expert witness for the state, had misrepresented his credentials and—significantly—that, if the jury had known about this misrepresentation, there was "a reasonable probability that the jury ... would have had a reasonable doubt as to Plude's guilt." *Id.* at 56. The court contrasted *Plude* with an earlier case [49] in which "another expert corroborated [the] substantive testimony" of a witness "who misrepresented his credentials...." *Id.* We asked both parties to file supplemental memoranda addressing the *Plude* decision, and they have done so.

In *Plude* the court specifically noted that Dr. Shaibani's testimony "was a critical link in the State's case." *Id.* There was no direct eyewitness testimony connecting the defendant to the alleged murder of his wife (he claimed that she had committed suicide by taking an overdose of drugs), and the jury heard a "cacophony of disparate medical opinions regarding the cause of [the wife's] death." *Id.* at 46. Because the trial was "rife with conflicting and inconclusive medical expert testimony," *id.* at 53, Dr. Shaibani was the only expert who was able to testify to a reasonable degree of certainty that Plude's statements about the position of his dead wife's body were (or may have been) false: "Shaibani's opinion testimony sets out facts that cause Plude's credibility to be questioned." *Id.* at 55. Furthermore, the Wisconsin prosecutor stipulated that Dr. Shaibani "was not a clinical professor at Temple University," *id.* at 51, and conceded that the evidence of his false testimony about his credentials was newly discovered, material, and not cumulative. *Id.* at 53.

In the instant case, however, the government argues—and we agree—that Dr. Shaibani's substantive testimony was not significantly different from that of Dr. Arden. As we have said, the trial court reasonably concluded that even if Dr. Shaibani had not testified at all, there was no reasonable likelihood that a different verdict could have ensued, given the eyewitness testimony, Dr. Arden's testimony, and the weakness of the defense evidence. Unlike *Plude*, in which Dr. Shaibani's testimony formed "a critical link," his testimony in this case was consistent with the government's other evidence. Moreover, his qualification as an expert witness was not predicated on his testimony about his continuing affiliation *vel non* with Temple University. Finally, as we have seen, the factual questions concerning Dr. Shaibani's status at Temple and how that affected his credibility were aired and argued extensively before the jury. We are satisfied, therefore, that this case is factually distinguishable from *Plude* and that a result similar to that in *Plude* is not warranted.

## VII

■ Appellant contends that the trial court erred when it overruled her objection to the prosecutor's use of several autopsy photographs during his closing argument to the jury. There was, she asserts, no reason to refer to the photographs when there were diagrams readily available, prepared by the medical examiner, which better demonstrated the location and nature of Brianna's injuries. Appellant argues that the prosecutor's use of the photographs served no purpose other than to inflame the jury, and that the court's refusal to intervene was reversible error.

---

**49.** That earlier case was *State v. Sprosty,* 248 Wis.2d 480, 636 N.W.2d 213 (Ct.App.2001). "In *Sprosty* the court of appeals concluded that there was no reasonable probability that false testimony by a witness, who misrepresented his credentials, would lead to a different outcome...." *Plude,* 750 N.W.2d at 56.

The government maintains in response that defense counsel did not sufficiently object to the prosecutor's use of the photographs. Counsel did note an objection when the prosecutor said that pictures of Brianna's body would be shown to remind the jury of the injuries she had sustained, because the extent of Brianna's superficial injuries was still in dispute. However, counsel did not articulate any basis for the objection, and the court overruled it. The prosecutor then proceeded to display to the jury five pre-incision photographs that had all been previously admitted into evidence.[50] Therefore, says the government, her present claim is reviewable only for plain error. *See Butts v. United States*, 822 A.2d 407, 419 (D.C.2003).

■ We need not decide whether there was plain error, for we are satisfied that there was no error at all. "In making its case to the jury, the government is not required to deliver a dispassionate presentation of sterile facts. The gritty reality of the crime, including its human toll, is relevant to the jury's consideration." *Chatmon v. United States*, 801 A.2d 92, 100 (D.C.2002). Thus, for example, in another murder case, we upheld the admission into evidence of five photographs of the murder scene and the body "which even the prosecutor characterized as 'gruesome.'" *Thacker v. United States*, 599 A.2d 52, 58 (D.C.1991), Although the pictures in this case were of a child who met a violent

death, they were not so emotionally upsetting as to require their exclusion. Moreover, the prosecutor displayed sensitivity when presenting them to the jury, noting for example that he would "show this exhibit [number 66] very quickly because it is very upsetting." On this record we can discern no undue prejudice, and thus no error, plain or otherwise, in the trial court's refusal to restrict the prosecutor's use of the photographs in his closing argument.

Appellant also contends that the prosecutor made two false statements during closing argument by telling the jury, first, that Brianna had been "badly beaten during the thirteen days she had lived in appellant's house," when in fact the trial court, in ruling on appellant's motion for judgment of acquittal, had ruled that Brianna's bruises were sustained within the immediate time period of the fatal injuries, and second, that the treating physicians at the hospital were "too busy" to notice Brianna's injuries. We find no merit in either contention.

As to the first claim, the prosecutor did not pinpoint the timing of any specific injury, and indeed there was evidence that Brianna had been beaten over the thirteen-day period, even though those injuries may not have been apparent at the time of her death.[51] As to the second claim, it is not entirely clear just which

---

50. The government suggests in its brief that appellant's challenge appears to be directed mainly to the number of photographs shown, since all of them had been admitted into evidence and were properly before the jury. The photographs in question were exhibits 66 (showing the front of Brianna's body and her hair partially braided), 71 (showing her left cheek), 73 (showing her chin), 75 (showing the back of her body), and 77 (a close-up view of the abrasion on her back). As the government reminds us, "Brianna's external injuries were a central issue at trial."

51. Lakeisha O'Brien testified that appellant had previously struck Brianna in the chest (see note 9, *supra*). Aaron O'Brien testified that Charissie Blackmond had hit Brianna on the butt with a leather belt, but he could not recall whether this had happened before or after Christmas. Dr. Stryjewski said that he noticed a bruise on Brianna's buttock which he believed to be "a couple of days old" (see note 11, *supra*).

comments appellant is now complaining about, since she did not object to them at the time they were made.[52] In any event, two physicians from Children's Hospital, Dr. Atabaki and Dr. Stryjewski, testified that when Brianna arrived at the hospital, she did not have a heartbeat, could not breathe, and was immediately intubated. From this evidence the prosecutor drew the inference that the doctors were more focused on trying to keep her alive than on what visible injuries she had sustained. The fact that a paramedic who brought her to the hospital did observe her facial injuries does not contradict the doctors' testimony, nor does it suggest that the doctors were (or were not) "too busy" to notice those injuries. We find no error and no basis for reversal in the prosecutor's closing argument.

## VIII

■ Finally, appellant maintains that the grand jury based its obstruction of justice charge on Tiffany O'Brien's statement that appellant told her not to say that Brianna fell down the stairs, whereas appellant was convicted of obstruction for telling Aaron O'Brien to say that Brianna fell down the stairs, which was not known to the grand jury at the time it returned the indictment. As a result, appellant contends that the government committed *per se* reversible error by constructively amending the indictment in violation of the Fifth Amendment.[53] She relies primarily on *Wooley v. United States*, 697 A.2d 777 (D.C.1997), in which the defendant was indicted for possession with intent to distribute heroin but convicted of possession with intent to distribute cocaine. We reversed the conviction, holding that the shift in proof from heroin to cocaine constituted a constructive amendment of the indictment. The government maintains in response that there was no constructive amendment here because the indictment charged only that appellant told "witnesses" to withhold information from criminal investigators without specifying who those "witnesses" were.[54] Therefore, the government contends, appellant's claim of constructive amendment lacks merit because appellant cannot identify a single word or phrase of the indictment that was altered by the evidence which the jury heard at trial. We think the government has the better argument.

■ Generally, departures from the indictment take two forms, amendments and variances. *See Woodall v. United States*, 684 A.2d 1258, 1263 (D.C.1996) "A departure from an indictment's terms becomes a constructive amendment when facts introduced at trial go to an essential element of the offense charged, and the facts are different from the facts that would support

---

52. The government plausibly suggests that appellant is complaining about the following excerpt from the prosecutor's argument:

Why didn't anybody see [the facial wounds] at the emergency room? You heard what Dr. Atabaki said, and Dr. Stryjewski: "When a kid gets into the emergency room and isn't breathing, the first thing you do is try to get them breathing. And when you do that, you put those tubes down and tape them on." And that is what happened here. And Dr. Atabaki told you, "You know, you try to note what you can, but you are primarily focused on the lifesaving

things that have to be done, and the first thing [is] those tubes and the tape."

53. Appellant points out that the prosecutor did not refer in either his initial summation or his rebuttal argument to Tiffany's statement, but instead referred only to Aaron's statement that his mother told him to say that Brianna fell down the stairs.

54. Telling even a single witness improperly to withhold information, of course, would constitute a violation of the obstruction of justice statute. *See* D.C.Code § 22–722(a) (2001), which speaks in terms of "another person."

the offense charged in the indictment." *Baker v. United States*, 867 A.2d 988, 997 (D.C.2005) (citations and internal quotation marks omitted). Since appellant did not raise her claim of constructive amendment in the trial court, our review once again is for plain error. *Johnson v. United States*, 812 A.2d 234, 242 (D.C.2002); *see Woodall*, 684 A.2d at 1262.

 "A constructive amendment occurs when 'the trial court permits the jury to consider, under the indictment, an element of the charge that differs from the specific words of the indictment.'" *Williams v. United States*, 756 A.2d 380, 388 (D.C.2000) (citation omitted). Here the indictment charged that appellant told "witnesses" to withhold information from government investigators. "This was the precise conduct of which appellant was convicted." *Pace v. United States*, 705 A.2d 673, 676 (D.C.1998). Because the indictment did not specify what that information was, appellant cannot identify any language in the indictment that was al-

tered by the evidence at trial. There was, in fact, no material difference between the trial evidence and the specific words of the indictment because, by instructing Aaron to lie about what happened to Brianna, she in effect told him to withhold what he knew to be the truth, as he testified at trial. Appellant's constructive amendment claim is without merit. *See Johnson v. United States*, 616 A.2d 1216, 1232–1233 (D.C.1992); *Ingram v. United States*, 592 A.2d 992, 1005 (D.C.1991).[55]

## IX

For the foregoing reasons, the judgment of conviction and the order denying appellant's motion for new trial are both

*Affirmed.*

---

**55.** Nor has appellant shown that there was any variance. A variance occurs when there is no change in the charging terms of the indictment, " 'but the evidence at trial proves facts materially different from those alleged in the indictment.'" *Scutchings v. United States*, 509 A.2d 634, 636 (D.C.1986) (citation omitted). Appellant has failed to demonstrate any prejudicial variance that would warrant reversal. *See Zacarias v. United States*, 884 A.2d 83, 86–87 (D.C.2005); *see also Baker*, 867 A.2d at 1000 n. 7 (no prejudicial variance when acts proven to jury and those alleged in indictment occurred on the same day, at the same time and the same location, and were done by the same individual).